[No. B170006. Second Dist., Div. One. Dec. 22, 2004.]

DYLAN POLLARD, Plaintiff and Appellant, v.
ERICSSON, INC., Defendant and Respondent.

[No. B170460. Second Dist., Div. One. Dec. 22, 2004.]

ANNA CLAUSEN, Plaintiff and Appellant, v.
NOKIA, INC., Defendant and Respondent.

COUNSEL

The Law Offices of Shawn Khorrami, Shawn Khorrami and Matt Bailey for Plaintiffs and Appellants.

Call, Jensen & Ferrell, Wayne W. Call, Scott J. Ferrell, Elizabeth K. Penfil and Melinda Evans for Defendant and Respondent Ericsson, Inc.

Bird, Marella, Boxer & Wolpert, Terry W. Bird, Thomas R. Freeman, Eric E. Bronson; Alston & Bird, Peter Kontio, Randall L. Allen and H. Suzanne Smith for Defendant and Respondent Nokia, Inc.

OPINION

**VOGEL, J.—** Subdivision (a)(17) of section 1770 of the Civil Code makes it unlawful to represent that a consumer will receive a rebate "if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction." In *Kramer v. Intuit, Inc.* (2004) 121 Cal.App.4th 574 [18 Cal.Rptr.3d 412], Division Two of our court held that this statutory language means what it says, and that there is nothing unlawful about a rebate offer conditioned on events that can occur before or at the same time as the transaction, notwithstanding that the event could also occur after the transaction is completed. Two rebate offers are before us in these consolidated appeals, one offered by Ericsson, Inc., the other by Nokia, Inc., both based on sales of cellular telephones conditioned on the extension or acquisition of AT&T Wireless service contracts. For the reasons explained below, we hold that, because both offers could be satisfied by the earlier or simultaneous purchase of the required service contract, neither transaction was unlawful, and demurrers to both complaints were properly sustained by the trial court.

## FACTS

In May 2001, when Dylan Pollard purchased an Ericsson cellular telephone at an AT&T Wireless store, Ericsson offered a $50 rebate with four conditions: (1) activating the cellular phone with AT&T Wireless service; (2) maintaining that service at least until the rebate was processed; (3) within 30 days of the date of purchase, completing a rebate form and mailing it to

Ericsson; and (4) cashing the rebate check within 90 days of the date the check was issued. Pollard took advantage of the offer, received a $50 rebate check, and cashed it.

In March 2002, when Anna Clausen purchased a Nokia cellular telephone at an AT&T Wireless store, Nokia offered a $59 rebate with three conditions: (1) executing or extending a cellular phone service contract with AT&T Wireless; (2) within a "predetermined time period," completing a rebate form and mailing it with proofs of purchase to Nokia; and (3) cashing the rebate check within a "predetermined time period." Clausen decided not to "undertake the substantial time and effort to put together the necessary documentation to receive her mail-in rebate check."

Pollard and Clausen, represented by the same lawyer, filed separate class action lawsuits against Ericsson and Nokia. As relevant, Pollard's and Clausen's operative pleadings allege that Ericsson and Nokia could not legally condition the rebates on the consumers' activation of their cellular service with AT&T Wireless because the condition violates subdivision (a)(17) of section 1770 of the Civil Code, which prohibits a representation that a consumer will receive a rebate "if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction."[1]

The trial court sustained Ericsson's and Nokia's demurrers without leave to amend, finding there were no violations of section 1770. Pollard and Clausen appeal, claiming both transactions were unlawful. We consolidated the appeals for argument and decision.

## DISCUSSION

In the trial court, Pollard and Clausen contended "[r]ebates are nothing but an industry ploy to lure consumers into purchasing products at the promise of a discount while allowing unscrupulous manufacturers, distributors, and sellers the opportunity to cheat consumers out of the very discounts which they were promised or to otherwise hold on to the promised rebates in an effort to artificially boost revenues." Their focus has narrowed on this appeal, to an argument in which they essentially redefine "rebate" to mean "discount" so that the rebate must be paid to them at the moment of purchase. As we explain, they are misreading the statute.[2]

---

[1] Subsequent undesignated section references are to the Civil Code.

[2] Pollard's and Clausen's briefs challenge the trial court's reasoning as well as the substance of its rulings. On this appeal, the court's reasoning is not dispositive, and we will affirm if the orders are correct on any theory. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)

## A.

■ In *Kramer v. Intuit, Inc., supra,* 121 Cal.App.4th at page 580, where the " 'advertised discount' " was $30 off Intuit's Quicken software when the consumer purchased TurboTax software, another Intuit product, "and no other additional or more expensive product [was] required but concealed from the consumer," Division Two of our court held that "[t]he underlying purpose of the Consumers Legal Remedies Act (§ 1750 et seq.), as proclaimed in the statutory scheme itself, is 'to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.' (§ 1760.) The portion of that statutory scheme in question here is listed under a chapter entitled 'deceptive practices,' and proscribes as 'unlawful' various 'unfair methods of competition and unfair or deceptive acts or practices,' including '[r]epresenting that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction.' (§ 1770, subd. (a)(17).)

"The only statement in the legislative history that specifically addresses section 1770, subdivision (a)(17) again focuses on deception. It establishes that the Legislature intended to prohibit merchants from advertising a rebate or discount when they conceal from consumers the conditions to be satisfied to receive the rebate or discount. Specifically, the relevant Assembly Committee Report explains by way of example that this subdivision would prevent a situation where the consumer would 'be required to buy an additional product before he could receive the advertised discount, or that he buy a more expensive and high quality product than the one advertised.' (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 292 (Sept. 30, 1970) 4 Assem. J. (1970 Reg. Sess.) p. 8466.)" (*Kramer v. Intuit, Inc., supra,* 121 Cal.App.4th at pp. 579–580.)

■ "The legislative intent of preventing concealment or deception by nondisclosure is further bolstered by the subsequent enactment of another statute addressing rebates. Almost two decades after the Legislature enacted section 1770, subdivision (a)(17), it enacted Business and Professions Code section 17701.5, which on its face recognizes the validity of mail-in rebates.[3] The statute requires the accurate advertisement of rebates, and it presumes that requiring a consumer to engage in a subsequent transaction—'send[ing] a coupon to the manufacturer for a cash rebate' . . . —after the consummation of the transaction is not a prohibited business practice. *There is again no*

---

[3] Business and Professions Code section 17701.5 provides that "[i]t is unlawful for any person to advertise a price that requires the buyer to send in a coupon to the manufacturer for a cash rebate, *unless the price actually paid to the person selling the item is clearly and conspicuously advertised along with the final price with the coupon.*" (Italics added.)

*indication that the Legislature intended to outlaw rebates that are neither deceptive nor misleading.*" (*Kramer v. Intuit, Inc., supra,* 121 Cal.App.4th at p. 580, fn. omitted, italics added.)

In *Kramer,* the consumer claimed the rebate was unlawful "because he was 'required to buy an additional product before he could receive the advertised discount,' " which he said made it " 'contingent on an event to occur subsequent to the consummation of the transaction.' " (*Kramer v. Intuit, Inc., supra,* 121 Cal.App.4th at p. 581.) Division Two disagreed, holding that "Intuit's rebate program [did] not necessarily *require* a subsequent purchase, and thus the earning of the benefit [was] not 'contingent on' a subsequent purchase. [¶] Intuit's rebate program [did] not require a subsequent purchase because the consumer ha[d] three purchase options to qualify for the rebate[, o]nly one of [which] involve[d] the purchase of the qualifying product, TurboTax software, after the purchase of the Quicken software. Under the terms of the rebate program, the other two scenarios to satisfy the rebate entail[ed] either (1) purchasing TurboTax and Quicken at the same time, or (2) purchasing TurboTax first and then Quicken. Neither of these two options involv[ed] the 'subsequent' purchase of TurboTax.

". . . Indeed, the broad language of the rebate sticker on the Quicken product box inform[ed] the consumer that the rebate [was] available if 'you buy certain TurboTax products' and if the rebate [was] 'postmarked within 30 days of TurboTax purchase.' The language of the rebate does not require that the consumer purchase TurboTax within 30 days *after* the Quicken purchase. Thus, Intuit's offer allow[ed] for a rebate if the additional software product, TurboTax, was purchased within 30 days of, at the same time as, or subsequent to the purchase of Quicken. Intuit's rebate sticker simply [did] not instruct that the consumer *must* purchase TurboTax subsequent to the purchase of Quicken." (*Kramer v. Intuit, Inc., supra,* 121 Cal.App.4th at p. 581.)

### B.

As noted above, Ericsson offered Pollard a $50 rebate provided he (1) activated his cellular phone with AT&T Wireless service; (2) maintained that service at least until the rebate was processed; (3) completed a rebate form and mailed it to Ericsson within 30 days; and (4) cashed the rebate check within 90 days of the date the check was issued. We see nothing deceptive or misleading about this offer, which Pollard concedes was disclosed at the time of purchase (*Kramer v. Intuit, Inc., supra,* 121 Cal.App.4th at p. 580), and we see nothing in the offer that makes it "contingent on an event to occur subsequent to the consummation of the transaction." (§ 1770, subd. (a)(17).)

To paraphrase *Kramer,* "the broad language of the rebate [offer] on the [Ericsson cell phone] inform[ed] the consumer that the rebate [was] available

if [he purchased AT&T cellular service] and if the rebate [form was] 'postmarked within 30 days of [the Ericsson] purchase.' The language of the rebate does not require that the consumer purchase [AT&T cellular service] within 30 days *after* the [Ericsson] purchase. Thus, [Ericsson's] offer allow[ed] for a rebate if [the AT&T service] was purchased within 30 days of, at the same time as, or subsequent to the purchase of [the Ericsson cell phone]. [Ericsson's] rebate [offer] simply [did] not instruct that the consumer *must* purchase [AT&T cellular service] subsequent to the purchase of [the Ericsson cell phone]." (*Kramer v. Intuit, Inc., supra,* 121 Cal.App.4th at p. 581.)[4]

■ We see nothing wrong with this rebate offer. As noted in *Kramer v. Intuit, Inc., supra,* 121 Cal.App.4th at page 580, the Consumers Legal Remedies Act does not suggest a legislative intent to outlaw rebates that are neither deceptive nor misleading. To the contrary, the legislative history shows the Act was "designed to provide affirmative remedies for consumers which will protect them from unscrupulous business practices while insulating responsible businessmen from spurious or vexatious lawsuits" and that, to that end, the Legislature intended the Act to be "construed liberally to promote the objective of efficient and economic consumer protection against unfair and deceptive business practices." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 292 (1970 Reg. Sess.) Sept. 23, 1970, 4 Assem. J. (1970 Reg. Sess.) p. 8466; see *Hutnick v. U.S. Fidelity and Guarantee Co.* (1988) 47 Cal.3d 456, 465, fn. 7 [253 Cal.Rptr. 236] [the committee report is a valid source for determining legislative intent].) ■ Quite plainly, the gravamen of the practice prohibited by subdivision (a)(17) of section 1770 is a false and misleading rebate offer that could be accepted *only* by a subsequent purchase of another product. In Pollard's case as in *Kramer,* that is not what happened.[5]

---

[4] The fact that Pollard could not cancel the AT&T cellular service until the rebate was processed does not transform the condition into a subsequent act. Everything Pollard was required to do could be accomplished at or before the time he purchased the Ericsson phone. As the Federal Trade Commission has recognized when considering federal controls over rebates, it is common to condition rebates on cellular telephone purchases on the activation of service plans with a designated cellular or internet service provider—and there is nothing illegal about this practice. (Sen. Bill No. 1154 (2003–2004 Reg. Sess.) § 1.)

[5] As explained in *Kramer v. Intuit, Inc., supra,* 121 Cal.App.4th at page 580, the Legislature's adoption of section 17701.5 of the Business and Professions Code, "which on its face recognizes the validity of mail-in rebates," persuades that subdivision (a)(17) of section 1770 confirms the Legislature's earlier intent to outlaw only those rebates that are deceptive or misleading. As the author of Assembly Bill No. 4124 (which enacted section 17701.5 of the Business and Professions Code) noted in a letter urging the Governor's approval, "[t]here is nothing wrong with rebates or informing consumers that rebates are available," provided that it is not done in a deceptive or misleading fashion. (Assemblyman Peter R. Chacon, letter to Governor Deukmejian, Aug. 17, 1990.) For these reasons, and because we will whenever possible avoid a statutory interpretation that renders one of two statutes superfluous, we reject

It follows that the demurrer to Pollard's first amended complaint was properly sustained without leave to amend. (*Chazen v. Centennial Bank* (1998) 61 Cal.App.4th 532, 542 [71 Cal.Rptr.2d 462]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

## C.

As noted above, Nokia offered Clausen a $59 rebate provided she (1) entered or extended a cellular phone service contract with AT&T Wireless; (2) submitted a rebate form and proofs of purchase within a specified period; and (3) cashed the rebate check within a specified period. Clausen decided not to "undertake the substantial time and effort to put together the necessary documentation to receive her mail-in rebate check."

Just as we found nothing wrong with Ericsson's rebate offer to Pollard, we find nothing wrong with Nokia's rebate offer to Clausen. To once again paraphrase *Kramer,* "the broad language of the rebate [offer] on the [Nokia cell phone] inform[ed] the consumer that the rebate [was] available if [she purchased or extended AT&T cellular service] and if the rebate [form was] postmarked within [a specified time after the Nokia] purchase.' The language of the rebate does not require that the consumer purchase [AT&T cellular service] within [a specified period] *after* the [Nokia] purchase. Thus, [Nokia's] offer allow[ed] for a rebate if [the AT&T service] was purchased [before], at the same time as, or subsequent to the purchase of [the Nokia cell phone]. [Nokia's] rebate [offer] simply [did] not instruct that the consumer *must* purchase [AT&T cellular service] subsequent to the purchase of [the Nokia cell phone]." (*Kramer v. Intuit, Inc., supra,* 121 Cal.App.4th at p. 581.)

■ Clausen suggests there is something wrong with the fact that Nokia's rebate offer could only be satisfied by a purchase from a third party service provider (AT&T Wireless) rather than from Nokia, but she does not explain her reasoning or what it is she thinks is wrong (which might be difficult to do since she purchased her Nokia telephone from AT&T Wireless). Subdivision (a)(17) of section 1770 prohibits a rebate "if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction," but it says nothing at all about a disclosed concurrent or earlier purchase from another entity—and we see nothing inherently unfair or misleading about the connection in this case. In short, subdivision (a)(17) of section 1770 prohibits bait-and-switch rebate offers that cannot be performed before or at the time of purchase, not a fully disclosed offer that happens to involve a third party.

---

Pollard's contention that section 17701.5 of the Business and Professions Code does no more than create an exception to subdivision (a)(17) of Civil Code section 1770. (*Tripp v. Swoap* (1976) 17 Cal.3d 671, 679 [131 Cal.Rptr. 789, 552 P.2d 749].)

It follows that the demurrer to Clausen's second amended complaint was properly sustained without leave to amend. (*Chazen v. Centennial Bank, supra,* 61 Cal.App.4th at p. 542; *Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.)

## DISPOSITION

The judgments of dismissal are affirmed. Ericsson and Nokia are entitled to their costs of appeal.

Spencer, P. J., and Mallano, J., concurred.